(2008)
Lonnie ROARK, et al., Plaintiffs,
v.
SOUTH IRON R-1 SCHOOL DISTRICT, et al., Defendants.
No. 4:06CV392 CDP.
United States District Court, E.D. Missouri, Eastern Division.
January 8, 2008.

MEMORANDUM AND ORDER
CATHERINE D. PERRY, District Judge.
Plaintiffs are parents of children who attend South Iron Elementary School. They bring this action to challenge the South Iron R-1 School District's decision to allow members of Gideons International to distribute Bibles to elementary school students during the school day. The parties have filed cross-motions for summary judgment. The undisputed evidence shows that both the old practice and the new policy were undertaken for the purpose of promoting Christianity and they have the effect of endorsing religion to impressionable elementary school students. The school policies violate the Establishment Clause, and I will grant plaintiffs' motion for summary judgment and deny defendants' motion.

Background
The South Iron R-1 School District has allowed the Gideons to pass out Bibles to the fifth grade, during class time and on school property, for several years. After a dispute over the practice arose in 2005, the District was advised by several sources that allowing the Bible distribution in classrooms during school hours was unconstitutional. It rejected that advice, overruled the decision of its superintendent, and voted to allow the distribution. Bibles were again distributed in October of 2005. Plaintiffs are parents who object to the distribution.
A week before the hearing scheduled on plaintiffs' request for preliminary injunction, the School District adopted a new policy that would allow outside groups to distribute literature, including Bibles, on school property in designated locations not to include the classroom. Despite this last-minute change in policy, I issued a preliminary injunction on September 5, 2006, enjoining defendants and any persons acting in concert with them from distributing or allowing distribution of Bibles to elementary school children on school property during the school day. Doe v. South Iron R-1 School Dist., 453 F.Supp.2d 1093 (E.D.Mo.2006). The Court of Appeal affirmed that ruling. Doe v. South Iron R-1 School Dist., 498 F.3d 878 (8th Cir.2007).
Plaintiffs' amended complaint alleges that South Iron's past practice of allowing the Gideons to distribute Bibles in the fifth grade classrooms (Count I) and South Iron's new policy allowing the distribution of Bibles in the cafeteria or in front of the administrative offices during the school day to elementary school students (Count II) violate the Establishment Clause of the First Amendment to the United States Constitution. Plaintiffs also allege violations of the Missouri Constitution (Counts III & IV). Plaintiffs seek summary judgment on Counts I and II, and defendants seek summary judgment on all counts.
After the parties had briefed their summary judgment motions, the Board again changed its policy. In defendants' supplemental filing, they notified the Court of the policy changes and argued that two of the changes are relevant to the Court's decision on summary judgment. Plaintiffs have moved to strike the new evidence, arguing that I should not consider the latest policy changes.

Undisputed Facts[1]
South Iron R-1 School District is a public school district in Iron County, Missouri. It operates elementary, junior high, and high schools in a single building with a shared entrance, cafeteria, library, and gymnasiums. The Board of Directors of South Iron R-1 School District is the entity that is ultimately responsible for the operation of the District.
Plaintiff Lesa Alcorn has two children who attend South Iron schools and who both received Bibles in their fifth grade classrooms at South Iron Elementary. Plaintiff John Doe has two children: one currently attends South Iron schools and the other has already graduated. His child who currently attends South Iron received a Bible in fifth grade from church members who came to the school. Plaintiff Lonney Roark has two children who currently attend South Iron Elementary but have not yet reached the fifth grade. None of the plaintiffs' children were in fifth grade during the 2005-2006 school year.
Defendants David Brewer, Mike Ruble, Mike Mayberry, Paul Daggett, Sarah Sullivan,[2] Darren Kelly, and Jeff Ruble are the current members of the South Iron School Board. Brewer, Ruble, Mayberry, and Daggett are named in their individual capacities and in their official capacities as members of the School Board. The other three School Board members are named in their official capacities only. Also named as defendants, solely in their official capacities, are the current superintendent of the school district, Bradley Crocker, and Shirley Bieser, who was principal of the elementary school at relevant times.[3]
For as long as anyone can remember, representatives of Gideons International have distributed Bibles to fifth-grade students in the South Iron schools without, until recently, any objection. Board members Michael Ruble and Jeff Ruble, and former Board member Jeff Casteel recall receiving Bibles in their South Iron fifth grade classrooms when they attended school. Jeff Ruble testified that Bible distribution had been occurring at South Iron for 30 years or more. The distribution was always to fifth graders during the school day in a classroom with a teacher or principal present. The Gideons would briefly tell about their organization and then invite the children to take a Bible. Neither the teacher nor the principal actively participated in the Bible distribution.
The avowed purpose of Gideons International "is the promotion of the Gospel of Christ to all people, to the end that they might come to know the Lord Jesus Christ as their personal savior." The purpose of distributing Gideon Bibles to school children is to encourage the children to accept Christ as their personal savior. Gideons believe their Bibles are a Christian version of God's word and that children would benefit from knowing God's, word. Although the Bibles distributed in 2005 did not contain such a passage, the Bible received by Alcorn's daughter in her fifth grade classroom contained a place for students to sign under the written statement: "My Decision to Receive Christ as My Saviour."
A few other outside groups have had access to the South Iron students and public school facilities in years past, but no other group besides the Gideons has had access to the students during the school day, in the classroom, to distribute noncurriculum related materials. The former superintendent, Homer Lewis, recalled that the only other group who visited a classroom during the school day was a group affiliated with the railroad who came to discuss railroad safety issues to a kindergarten class ten years ago. Principal Bieser was not aware of any outside group, other than the Gideons, who had distributed information to students during the school day. Other groups, mostly governmental organizations, had been invited to participate in the school's annual health fair, which is offered as part of the curriculum on health, safety, and welfare. In addition, the Girl Scouts were allowed to pass out information to parents at an evening open house.
After attending a regional meeting of superintendents offered by Missouri's Department of Elementary and Secondary Education in the summer of 2004, former-superintendent Homer Lewis decided to stop the practice of in-class Bible distribution because he believed it violated the Establishment Clause. In the fall of 2004 when the Gideons called the elementary school to arrange the annual distribution of Bibles, Lewis refused to authorize it. At the School Board's meeting on February 7, 2005, a representative of the local Ministerial Alliance asked the Board to reconsider Lewis's decision. Lewis explained to the Board why he believed the distribution of Bibles was illegal based on the information he had learned during meetings over the previous summer and on advice he had received from the school's attorney, and from the Missouri. Council of School Administrators' attorney, a member of the Missouri Department of Elementary and Secondary Education, an attorney with the District's insurance carrier, and one other attorney. He further stated that if the Board wanted to allow the distribution of Bibles at school, it should adopt an "open forum" policy that would not allow discrimination against any organization. The Board made no decision or comment on the suggestion of an open forum policy, but instead voted to "pretend this meeting never happened, and to continue to allow the Gideons to distribute Bibles as we have done in the past."
The Bible distribution was again discussed by the Board at a September 6, 2005 meeting. Two local pastors and a member of the Gideons addressed the Board. Superintendent Lewis read letters from the District's attorney, the ACLU, and the District's insurance provider, reiterating the illegality of their current practice of Bible distribution. The Board discussed alternative arrangements, such as letting the students distribute the Bibles. The Gideons, however, indicated that they must be present when their Bibles were distributed. The Board was not provided any information suggesting that it would be legal to distribute Bibles during class time. Despite this, Board member David Brewer moved to allow the Gideons to come into the South Iron schools and distribute Bibles to fifth graders. Mike Ruble seconded the motion and it passed.
Shortly after this meeting, Superintendent Lewis submitted his letter of resignation, effective at the end of the school year, indicating that he felt the Board was "headed down a path that is both illegal and costly" to the District. Lewis testified that the Board's vote to override his decision on Bible distribution was not the sole reason for his resignation, but he mentioned no other reason in his letter.
At the October 3, 2005 School Board meeting, all Board members received a copy of a letter from the school attorney urging them, to rescind the motion allowing distribution of Bibles by the Gideons. Plaintiff Alcorn addressed the Board about her concerns on the Bible distribution. The Board was informed that the Gideons had contacted elementary principal Bieser that day concerning the distribution of Bibles and that they were not accommodated. The Board took no action and refused to discuss the matter further.
On the following day, Board members Daggett and Brewer along with a member of the Gideons, went to meet with principal Bieser at the elementary school to find out when the Bibles could be distributed. They settled upon the 15-minute homeroom period between recess and the dismissal of the students for the day. That afternoon two Gideons arrived at the school, introduced themselves to Bieser, and said they were there to pass out Bibles. Bieser called superintendent Lewis who told the Gideons that he was not there to talk them out of distributing Bibles and that while it was a controversial issue, the Board had approved the Bible distribution.
The Gideon Bibles were distributed that afternoon at 2:30 p.m. in both fifth grade classrooms; attendance was mandatory. The teachers were temporarily excused from the room and principal Bieser stood inside the doorway. The Gideons made a brief presentation and then invited the children to take a Bible off the table in front of them. One child asked to take a Bible for an absent student and was given a second Bible. The Gideons told the students that if their parents did not want them to have a Bible, then they should return their Bible to the principal.
This action was filed on February 28, 2006. The lawsuit was discussed at Board meetings the following two months. At the April 3, 2006 meeting, the School Board discussed several options for distributing Bibles, including: adopting a policy allowing children to distribute Bibles; starting a Christian Club to meet before or after school and allowing the Club members to distribute Bibles; and becoming an open forum that would allow any group to distribute materials even if they were not in the best interest of the students and community. Then-Board-President Jim Scaggs announced that continuing to permit Gideon Bible distribution made the district an open forum. The Board agreed that this was true. Scaggs then moved to rescind the motion allowing the Gideons to distribute Bibles. His motion failed.
At a special meeting of the School Board on April 6, 2006, called because of recent election results, the District's attorney reported on the refusal of the District's insurer to represent the District in this lawsuit, and he again advised the Board that allowing the Bible distribution during instructional time violated the federal and state constitutions. The Board took no action to change the policy. After this meeting, Board member Mike Ruble contacted Liberty Counsel, who agreed to represent the School Board. At the June 19, 2006 meeting the Board voted to retain Liberty Counsel.[4]
On August 7, 2006, ten days before the scheduled hearing on plaintiffs' motion for preliminary injunction, the School Board met and passed a new policy on literature distribution. The new policy was prepared by Liberty Counsel and it allows outside groups to distribute printed material to students, subject to certain conditions. Any group wishing to distribute materials must provide the materials to the superintendent 48 hours before the requested time of distribution; if the superintendent does not respond within 48 hours then the materials may be distributed. Distribution will be either directly in front of the administrative offices or in the cafeteria, and the literature may be distributed either before or after the school day, before or after classes, or during lunch time. All requests will be approved unless the material is libelous or violates law, is obscene, advertises products or services for sale, endorses a candidate for public office, promotes alcohol, tobacco, drugs or other illegal activity, or is likely to cause substantial disruption to the school. The policy states that no student can be compelled or coerced by anyone to accept literature that has been approved for distribution under the policy.
As of March 2007, no requests to distribute literature under the new policy had been received by South Iron. Current superintendent Crocker states that he would not allow Gideons to distribute Bibles in the same manner as they have in the past under the new policy. The policy provides for appeals to be submitted in writing to the Board of Education, for appeals to be heard at the next regularly scheduled Board meeting, and for the Board to provide its decision within five days of that hearing. The Board makes the ultimate decision on whether or not to grant a literature distribution request. The School Board has never expressly repealed or rescinded any of its motions to allow the Gideons access to the fifth grade classrooms during the school day to distribute Bibles.

Discussion

A. Legal Standards on Summary Judgment
The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. Anderson, 477 U.S. at 249, 106 S.Ct. 2505.

B. Motion to Strike
After the close of discovery and after the summary judgment motions were fully briefed, defendants filed an additional affidavit. In the new affidavit Superintendent Crocker states that the School Board passed an amended policy on May 7, 2007. According to defendants, two major changes to the policy are relevant to the Court's summary judgment ruling. First, the amended policy prohibits the distribution of literature under the policy by any "school official, staff member or employee of the District." Second, the amended policy requires that the School Board approve any request to distribute material that has been appealed to the Board, unless the material falls within one of the policy's prohibited material types.
Plaintiffs seek to strike the late-filed affidavit, arguing that defendants filed it without leave of court despite the fact that the affidavit introduces new evidence and arguments. Plaintiffs also argue that the affidavit is unfairly prejudicial to them because they have not had the opportunity to conduct discovery on the amended policy and this second last-minute change in policy by the defendants demonstrates a pattern of behavior which shows an attempt to forever evade final review.
I agree with plaintiffs that defendants' repeated behavior of making changes to their policy at the last minute and then arguing that such changes radically alter the constitutionality of their actions is frustrating and appears intended to evade final review. However, although the latest changes are relevant to some of the arguments made by the parties, they do not alter my decision and therefore there is no prejudice to plaintiffs from my consideration of the policy changes.

C. Count I: Past Practices[5]

1. Mootness of Plaintiffs' Challenge to Past Practices
Defendants argue that plaintiffs' challenge to the past practice of Bible distribution in the classroom is moot because the Board has passed a new policy. Plaintiffs, on the other hand, have provided substantial arguments for why their claim is not moot.
According to the Supreme Court, when determining whether a request for declaratory relief has become moot, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). However, in cases where the defendant has voluntarily changed or discontinued the allegedly unconstitutional activity, the analysis is more narrowly tailored:
[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. A controversy may remain to be settled in such circumstances, e.g., a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.
U.S. v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (citations omitted). For the Court to find that the case has become moot, the party asserting mootness has the heavy burden of demonstrating that there is no reasonable expectation that the wrong will be repeated or that the challenged conduct will not start up again. Id. at 633, 73 S.Ct. 894; Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000).
In this case, the illegal nature of Bible distribution in the classroom was brought to the Board's attention by the school superintendent, school attorney, and reiterated by multiple other sources. In the meetings following this disclosure, the Board voted to pretend the meeting never happened and to continue to allow the Gideon distribution (February 7, 2005), voted to pass a motion to allow the Gideons to continue the in-classroom distribution (September 6, 2005), refused to discuss the Bible distribution matter (October 3, 2005), and voted down a motion to rescind the prior motion allowing the Gideon Bible distribution (April 3, 2006). It was only at a meeting ten days before the preliminary injunction hearing that the Board unanimously voted to pass the new policy, written by its new Liberty Counsel attorneys. The record is devoid of any indication as to why the Board passed the new policy. The Court can reasonably assume from the Board's past actions and comments, and from the timing and circumstances of the new policy and its amendments, that it was passed and changed simply in response to this litigation. This must be considered in a mootness challenge since "it is the duty of the court to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit." W.T. Grant, 345 U.S. at 632, 73 S.Ct. 894.
In United States Department of Agriculture v. Federal Labor Relations Authority, 876 F.2d 50 (8th Cir.1989), the Eighth Circuit found that the controversy between the parties was moot because the defendants had passed new regulations. The court relied on the defendants' realization that their prior position was illegal, defendants' genuine willingness to comply, and the lack of a hostile or defiant attitude on defendants' part. These factors led the Court to conclude that it was extremely unlikely that the defendants would rescind their regulations and return to their old ways. Overall the Court found that defendants were not just attempting to evade sanction. Id. at 52.
Defendants' conduct here is entirely different from that in Department of Agriculture. The School Board defendants may have voted to pass the new policy, but there is absolutely no indication that they did so because they realized that their old practice was flawed and possibly unconstitutional. To the contrary, they continue to argue that their past practice was proper, and statements from their depositions show that many of them do not view the new policy as either a necessary or a positive change. For example, Board member Paul Daggett saw nothing wrong with the old practice:
Q. You don't think there was anything wrong with the way you were doing things before this policy was adopted. Is that right?
A. As long as they treated everybody the same.
Similarly, Board member Michael Ruble had no problem with the prior practice: "I still think that the way the Gideons did it in the past is fine." But he stated that the policy was passed because "if [it] clears up anybody from wanting to try and line their pockets over some two-bit lawsuit like they are now then we'll just change it to that and try and clear up everything." In addition, Ruble admits that he thought passing the new policy would negate the need or reason for a preliminary injunction in this case.
Not only do these statements demonstrate that the Board does not realize that the prior practice was flawed, they also indicate a lack of willingness to comply with the law in the future. The fact that the new policy was passed by the Board does not erase the past actions of the Board  actions that were taken when they were acting independently of their current counsel's advice. The Board repeatedly refused to follow the legal advice of their own attorneys, instead choosing to "vote that this meeting never happened." From the filing of this suit in February 2006 until August 2006, the Board took no action to address the matters at issue in this suit. This reaction demonstrates a hostile or defiant attitude on defendants' part. Under the factors analyzed by the Eighth Circuit in Department of Agriculture, the controversy between the parties in this case is not mooted by the defendants' passage of the new policy.
Similarly, as in W.T. Grant, a controversy concerning the legality of the defendants' past practice remains. A strong public interest in having the legality of the practice settled, combined with the fact that the defendants would otherwise be free to go back to their past ways, supports the conclusion that the issue here is not moot. Other considerations by the Supreme Court in the mootness analysis include: whether the defendant's expressed intent to comply was bona fide, the effectiveness of the defendant's change, and the character of past violations. Id. at 633, 73 S.Ct. 894. The Board's new policy was passed days before the preliminary injunction hearing in an attempt to avoid injunctive relief. Based on the timing and the character of the defendants' past actions, I cannot conclude that the defendants had bona fide motives and were passing the new policy with a genuine intent to comply with the law.
The record of defendants' past actions, in combination with the strong public interest in reaching a determination of the legality or illegality of the past practice, compels the conclusion that the plaintiffs' challenge to the defendants' past practices is not moot.

2. Constitutionality of Past Practice
The Establishment Clause of the First Amendment "mandates governmental neutrality between religion and religion, and between religion and nonreligion." McCreary County v. American Civil Liberties Union, 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). Whether governmental activity results in a prohibited establishment of religion should be analyzed under the test announced by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). See ACLU Nebraska Foundation v. City of Plattsmouth, Nebraska, 419 F.3d 772, 775 (8th Cir.2005). Under the Lemon test, a government practice is permissible for purposes of Establishment Clause analysis only if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion. Id.
Numerous cases have held that the distribution of Gideon Bibles to elementary school students on school property and during school hours violates the Establishment Clause. See Berger v. Rensselaer Central School Corp., 982 F.2d 1160 (7th Cir.1993); Meltzer v. Board of Public Instruction, 548 F.2d 559, 575 (5th Cir.1977); Chandler v. James, 985 F.Supp. 1094, 1101 (N.D.Ala.1997); Goodwin v. Cross County School Dist. No. 7, 394 F.Supp. 417 (E.D.Ark.1973); Tudor v. Board of Education, 14 N.J. 31, 100 A.2d 857, 868 (1953); Brown v. Orange County Board of Public Instruction, 128 So.2d 181, 185 (Fla.Dist.Ct.App.1960). All of these cases held unconstitutional the exact Gideon program that defendants approved here.
Berger is the most recent appellate case directly on point. In Berger the Seventh Circuit considered and rejected all the same arguments that defendants make here. In particular, the Court rejected the argument that refusing to allow the distribution would constitute impermissible viewpoint discrimination. The Berger Court concluded that the board's free speech argument did not excuse the blatant violation of the Establishment Clause that occurred when the board sanctioned the distribution of Bibles during the school day. Id. at 1165-68.
Similar to the facts here, the Bible distribution in Berger occurred in classrooms "during regular school hours ordinarily reserved for teaching." Berger, 982 F.2d at 1166 n. 5. The Berger Court emphasized the difference between the "captive audience" of a classroom and the use of the school facility for activities held after-hours by distinguishing the Supreme Court decision Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981):
In Widmar, the Supreme Court held that a university could not exclude a religious organization from after-school use of its facilities after allowing nonreligious groups similar access. Yet Widmar differs from this case in one critical respect: the religious group in Widmar sought access to classrooms after school, the Gideons seek access to classrooms during school. In other words, the organization in Widmar sought access to public school facilities. The Gideons, by contrast, are not particularly interested in public school classrooms for their physical properties; indeed, it is doubtful that they would seek access to classrooms were they not populated by young children. There was no captive audience in Widmar  the classrooms were empty.... That the Gideons seek access to children and not facilities, as in Widmar, is self-evident.
Berger, 982 F.2d at 1166-67. Accord Doe, 498 F.3d at 883 ("In particular, we agree with the district court and the Seventh Circuit in Berger that distributing Bibles to fifth graders in the classroom raises far graver Establishment Clause concerns than, for example, permitting outside groups to distribute religious flyers on school premises or inviting ministers to give nonsectarian prayers at graduation ceremonies.").
Defendants argue that more recent cases on Establishment Clause jurisprudence look far more favorably on the practice than the cases that have considered it in the past. They point to cases such as Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and Good News Club v. Milford Central School, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) for the proposition that if a state actor opens its facilities to others, it must also open them to religious groups. While there is no doubt that the Supreme Court has made clear that a government cannot be hostile to religion by engaging in viewpoint discrimination, there is simply no evidence that those cases have any applicability to the District's past actions.
The recent Supreme Court cases have expanded religious groups' access to school funding and facilities, but none of those cases involved distributing religious materials or holding religious activities in the classroom during the school day. See Milford supra (excluding religious club from meeting after hours at school is unconstitutional viewpoint discrimination); Rosenberger, supra (denial of funding amounted to viewpoint discrimination); Lamb's Chapel v. Center Moriches Union Free School District et al., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)(violation of First Amendment to deny church access to school facility for religious film series).
Defendants also argue that the School District has had an "open forum" all along, and that therefore their actions could not have the primary effect of advancing religion. As in Berger, the evidence does not support this after-the-fact attempt to claim that an "open forum" policy already existed. The Board's minutes directly contradict the defendants' argument that they had an open forum in the past. The Board was told by its superintendent, its lawyer, and its insurance company that it was violating the constitution, yet it still considered and rejected establishing an open forum policy. Minutes of a later meeting show that the president of the Board stated that the district had an open forum policy, but that statement is contrary to the earlier minutes, and all the evidence indicates that the reference to an open forum policy in the later minutes was simply an attempt to cast the District's action in a more favorable light for the litigation. When former-Superintendent Lewis suggested that the Board adopt an open forum policy in the spring of 2005, the Board rejected this proposition and voted "to pretend like this meeting never happened." There was no further discussion of the "open forum" policy in the Board meetings until after this lawsuit was filed.
The deposition testimony of the Board members further supports the conclusion that the school's claim of an open forum policy was created in response to litigation. While several Board members testified that they always thought there was an open forum, they cannot point to a written policy creating it or to any basis for this conclusion. Indeed, the district had a written policy regarding what extracurricular materials students could distribute, and that policy has many restrictions and rules. It is inconceivable that the District would have such explicit restrictions on student distributions, but at the same time would have allowed unfettered access to outsiders. The evidence shows that the only group who has been allowed access to the students in the classroom during the school day is the Gideons. The Board's conclusion that it has been operating under an open forum policy all along is based on self-serving, after-the-fact justifications that are devoid of any reliable support.
Further, even if the Board did have such a policy, there has been no development in Establishment Clause jurisprudence in the years since Berger that would suggest that an open forum policy sanctions the conduct at issue here. No case has held that a school district must allow students to receive Bibles in the classroom to avoid committing impermissible viewpoint discrimination. Even in Peck v. Upshur County Board of Education, 155 F.3d 274 (4th Cir.1998), on which defendants rely, the court distinguishes the facts of this case from the distribution of Bibles in a hall or library: "The Bibles are not distributed in the formal classroom setting, are not part of classroom activities, and are not part of the schools' curriculum." Id. at 282.
Jabr v. Rapides Parish School Board, 171 F.Supp.2d 653 (W.D.La.2001) is a district court case involving a situation similar to that here, although it was not a Gideon program. In Jabr the school principal gave Bibles to fifth grade students as he wished each one a "Merry Christmas" in his office. Id. at 659. The plaintiffs daughter, who was Muslim, alleged that she was pressured to take a Bible. The District Court considered the facts under various Establishment Clause tests, and concluded that whichever test was used, the district had violated the Constitution. Jabr's reasoning is both persuasive and directly applicable here. The principal's office setting has the same coercive effect and captive audience as the classroom  a fact relied on by the district court in its ruling. Id. at 663.
The School District's past practices fail under the Lemon test. Defendants have not suggested a secular purpose for the distribution of Bibles by outside adults during, school hours in the classroom. There is no evidence that Bibles were part of the classroom curriculum or that they were intended to serve an educational function. The Gideon Bible distribution served no secular legislative purpose.
The principal or primary effect of the classroom Bible distribution was the advancement of religion. "The effect prong [of the Lemon test] asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (quoting Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (O'Connor, S., concurring)). The distribution of"Bibles in the classroom during school hours with school personnel present sends a message of endorsement of the Bible and its teachings, especially when the audience is impressionable elementary school students. Additionally, the distribution's location, time, and circumstances created an excessive entanglement with religion.
As have numerous other courts when faced with this exact activity, I conclude that the South Iron School District's past practice of allowing Gideon Bibles to be distributed in the fifth grade classrooms while attendance was mandatory is a violation of the Establishment Clause of the First Amendment.

3. Relief
According to their first amended complaint, plaintiffs seek the following relief for all counts of their complaint:
A. Declaratory judgment finding that Defendants' actions in facilitating the distribution of bibles in fifth grade classrooms during class time violate the Establishment Clause of the First Amendment of the Constitution of the United States as applied to the state through the Fourteenth Amendment, Article 1, § 7 of the Missouri Constitution, and Article 9, § 8 of the Missouri Constitution.
B. Declaratory judgment finding that Defendants' actions in instituting a policy that will facilitate the distribution of Bibles to elementary school students during the school day violates the Establishment Clause of the First Amendment of the Constitution of the United States as applied to the states through the Fourteenth Amendment, Article 1, § 7 of the Missouri Constitution, and Article 9, § 8 of the Missouri Constitution.
C. Preliminary and permanent injunctions preventing and restraining Defendants from further endorsement of religion at South Iron Elementary School or within the School District;
D. Nominal damages against Defendants David Brewer, Mike Ruble, Mike Mayberry, and Paul Daggett.
[E.] An award of costs and attorney fees pursuant to 42 U.S.C. § 1988.
Based on my holding that the defendants' in-class distribution violated the Establishment clause, plaintiffs are entitled to a declaratory judgment that the past practice is unconstitutional, and they are entitled to an injunction to assure that defendants do not revert back to their old policy once this lawsuit is over.
Whether plaintiffs are entitled to nominal damages is not clear from the record. As set out above, the only defendants against whom the amended complaint sought nominal damages are defendants David Brewer, Mike Ruble, Mike Mayberry, and Paul Daggett. In one of their briefs plaintiffs state that they do not seek damages against the individually named board members. See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Docket # 73, p. 3 (April 11, 2007). In the next brief, however, plaintiffs say that although they are not seeking nominal damages for the 2005 vote, they should get nominal damages "against those Defendants that facilitated the unconstitutional practices" in the past. See Plaintiffs' Reply brief, Docket # 79, p. 5 (April 25, 2007). These arguments are inconsistent, and I will deny the request for nominal damages for that reason.

D. Count II: New Policy
As with the old policy, for plaintiffs to show that the new policy violates the Establishment Clause they must prove that the School Board's policy fails the Lemon test. See ACLU Neb. Found., 419 F.3d at 775 (Government practice is permissible for purposes of Establishment Clause analysis only if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion). In McCreary, the Supreme Court reaffirmed that the "purpose" test of Lemon is not only important in an Establishment Clause analysis, but also that the government's purpose can be dispositive of the constitutional enquiry. 545 U.S. at 850-51, 861-63, 125 S.Ct. 2722. The undisputed evidence here shows that the District's purpose in passing the new policy was the promotion of Christianity, and therefore it violates the Establishment Clause.
The question under Lemon's purpose prong is "whether government's actual purpose is to endorse or disapprove of religion." Wallace, 472 U.S. at 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (quoting Lynch, 465 U.S. at 690, 104 S.Ct. 1355) (O'Connor, J., concurring). Purpose should be ascertained from the perspective of the "objective observer, acquainted with the text, legislative history, and implementation of the statute," or comparable official act. McCreary, 545 U.S. at 863, 125 S.Ct. 2722 (citing Santa Fe Independent School District v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)). When faced with a professed secular purpose for an arguably religious policy, the courts have a duty to distinguish whether the secular purpose is genuine or a sham, and to ensure that the purpose is not merely secondary to a religious objective. Id. at 864, 125 S.Ct. 2722.
Defendants argue that because the new policy was passed by the Board without comment, plaintiffs cannot present any evidence to suggest that the policy was intended to perpetuate the past, unconstitutional practice. Although deference is usually granted to a legislature's stated reasons for passing a policy, McCreary, 545 U.S. at 864, 125 S.Ct. 2722, such deference is not appropriate here because there simply is no statement of governmental purpose to which I could defer. There is no language in the policy that clearly delineates its purpose, and the Board minutes reflect nothing that would shed light on the purpose. The history of the Board's actions, however, speaks volumes.
In Santa Fe, the Supreme Court evaluated the purpose of a school prayer policy under the Establishment Clause by looking at the evolution of the current policy, the historical context, and the nature of the action itself. Based on these factors, the Court held that it was reasonable to infer that the specific purpose of the policy was to preserve a state-sponsored religious practice. 530 U.S. at 309, 120 S.Ct. 2266.
Similarly, evidence of the School Board's behavior here raises a very strong inference that the purpose of this new policy is to promote Christianity by providing a means for Christian Bibles to be distributed to elementary school students. Despite warnings from multiple sources, the School Board took no action to address the legality of its long-standing Bible distribution practice until forced to do so by this lawsuit and the impending preliminary injunction hearing. There has been little change in Board membership since the issue of the constitutionality of the Bible distribution was brought to the Board's attention by former-superintendent Lewis in 2004. The same Board members who voted to continue distributing Bibles in the fifth grade classrooms, despite warnings from legal counsel, also voted to pass the new policy. Some of the Board members expressed their opinions during depositions that there was nothing wrong with the earlier unwritten policy.
Even though the new policy changes the location of the distribution  from the classroom to either in front of the administrative offices or at a table in the corner of the cafeteria  the Bibles are still being distributed during school hours on school property to elementary school students. The shift from the old, unwritten policy to the new, written policy is not a dramatic or significant change, as argued by defendants, but is simply a continuation of the previous policy's allowance of Bible distribution at school. As in Santa Fe, the history of the Board's actions indicates that the District passed the new literature distribution policy with the intent to preserve the practice of Bible distribution at the school.
Although there is no doubt that the Establishment Clause "lacks the comfort of categorical absolutes," McCreary, 545 U.S. at 860 n. 10, 125 S.Ct. 2722, there is also no doubt that the Clause still means that a government cannot take actions for the purpose of promoting Christianity, which is what the Board wants to do here. The Supreme Court conducted a similar purpose analysis to Santa Fe in McCreary, and held that the evolution of a display of documents which included the Ten Commandments evinced a religious purpose. Like the government in McCreary, the school district here reaffirmed its commitment to promoting Christianity even after being told that the activity violated the Establishment Clause. Like the defendants in McCreary, the school district here changed counsel, modified its promotion of Christianity at the last minute, and then argued that its new actions met constitutional muster. Like the Board here, the defendants in McCreary made no attempt to defend their undeniable objective. Instead, the McCreary defendants simply argued that only their last actions should be considered. The Supreme Court rejected that argument: "They argue that purpose in a case like this one should be inferred, if at all, only from the latest news about the last in a series of governmental actions, however close they may all be in time and subject. But the world is not made brand new every morning ..." 545 U.S. at 866, 125 S.Ct. 2722. The Court went on to remind us that common sense still has a role: "[Defendants'] position just bucks common sense: reasonable observers have reasonable memories, and our precedents sensibly forbid an observer `to turn a blind eye to the context in which [the] policy arose.'" Id. As in McCreary, the evidence presented here demonstrates a religious purpose.
Defendants argue that McCreary is inapposite because the new policy is a significant change from the old policy, and because the presence of religion is only a possibility under the new written policy. The Board's change from an unwritten policy to a written one, with no statement explaining the reasons for the change, does not demonstrate a significant change in purpose. The old policy was intended to accommodate the distribution of Bibles at the school and the same is true of the new policy. The silence of the School Board when passing the new policy not only leaves this Court with no statement of governmental purpose, it also indicates no repudiation or change of heart on the part of the School Board members. This silence, in combination with the history and evolution of the new policy, including the timing of its passage, would lead a reasonable observer to believe that the Board's purpose has not changed.
Similarly, there is no merit to defendants' argument that the language of the new policy "might" allow the Gideons to distribute Bibles, as opposed to a policy which specifically mentions religion or religious materials. Where the history and evolution of a policy evince a religious purpose, as is true here, looking beyond the language of the policy is appropriate.[6] Although the Board passed a new policy, it has never repealed or rescinded its previous motions to allow Gideon distribution of Bibles  one such motion reaffirmed as recently as April 2006. Although non-religious items could also be distributed under the new policy, there is no evidence that anyone wants to distribute anything other than Bibles or that anyone has ever sought to do so. The new policy is a mere continuation of the past unconstitutional behavior.
No consideration of the second or third prongs of the Lemon test is necessary if a governmental action does not have a clearly secular purpose. Wallace, 472 U.S. at 56, 105 S.Ct. 2479; see also McCreary, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (finding of religious purpose was basis for Establishment Clause violation). Therefore, the Court's holding that the new policy was passed for a religious purpose is enough for plaintiffs to prove an Establishment Clause violation. However, the Lemon "effect" prong provides further support for the Court's ruling because the School District's new policy has the principal or primary effect of conveying a message of endorsement. See Wallace, 472 U.S. at 56, 105 S.Ct. 2479.
No reported case has held that the distribution of Bibles to elementary school students during school hours and on school property  even if outside the classroom  is permissible. To the contrary, every case that has considered the issue has decided that the Constitution does not allow it. None of the Courts of Appeals cases cited by the defendants dealt with policies as broad as the one here. Even Peck, in which the Fourth Circuit upheld a school policy that would allow distribution of Bibles or other religious literature to secondary school students, found the same policy unconstitutional to the extent it would allow distribution to elementary school students. 155 F.3d at 288, n. *.
Defendants argue that the Supreme Court in Milford, decided after Peck, suggested that the Fourth Circuit was wrong to limit its holding to secondary students, and that the same policy would be constitutional for elementary students. In support of this proposition defendants point to recent Courts of Appeals opinions interpreting Milford that have allowed distribution to elementary school students of flyers announcing religious community activities. See Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Township School District, 386 F.3d 514 (3rd Cir.2004)(Good News Club must be allowed to distribute flyers under district policy allowing other community groups to do so); Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools, 373 F.3d 589 (4th Cir.2004)(same); Rusk v. Crestview Local School District, 379 F.3d 418 (6th Cir.2004)(school that distributed information from a variety of community groups could not exclude religious groups); Hills v. Scottsdale Unified School District, 329 F.3d 1044 (9th Cir.2003)(distribution of summer camp brochure with religious content does not violate the Establishment Clause).
I relied on the distinction between the distribution of flyers and that of Bibles in granting preliminary injunctive relief. Defendants criticize that distinction and label it viewpoint and content discrimination that is "repugnant to core First Amendment values." However, the Supreme Court has stated that "the place of the Bible as an instrument of religion cannot be gainsaid." School Dist. of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 224, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Bibles are religious literature and many Christians believe that they contain the word of God. The Eighth Circuit recognized that the precedents governing school cases such as this one "are inherently based upon content-based distinctions," Doe, 498 F.3d at 883. The cases do not prohibit the exercise of common sense. And common sense tells us that a flyer advertising a church camp is different from a Bible. A person need only read the Bible to be confronted with a religious viewpoint, but reading a flyer does not have the same effect  the flyer requires a person to take follow-up action in order to be exposed to a religious message. This distinction between flyers and Bibles is not based on religious viewpoint  both items reflect the Christian viewpoint and promote Christian values. Instead the distinction is based on the types of religious material. The distinction is even more pronounced in the context of school children where flyers advertise religious activities that often require parental consent for attendance.
Defendants argue that the Peck case, despite its distinction between elementary and secondary school students, supports their arguments. Based on my reading of Peck, I am not convinced that the Fourth Circuit would have reached the same conclusion with the factually-distinct distribution policy at issue here. The policy here does not provide many of the safeguards that the policy in Peck required for distribution of Bibles to secondary students. These safeguards were repeatedly referred to and relied upon by the Fourth Circuit in deciding that case. 155 F.3d at 280, 281, 282, 287. For example, the distribution policy in Peck only allowed for the distribution of Bibles or other religious materials on a single day during the year. Id. at 275, 281, 282-83, 285-88. The policy here has no limit to the number of days that Bibles can be distributed at South Iron schools. Also, the tables used to distribute the Bibles in Peck were required to bear disclaimer signs renouncing any sponsorship or endorsement by the school. Id. at 278, 281, 282, 287. No such disclaimer is required under the facts of this case.[7]
These restrictions or safeguards were specifically relied upon by the Fourth Circuit in finding that the school children would not perceive the Bible distribution as an endorsement of religion by the school. Id. at 287 ("we believe that students are particularly capable of recognizing [the distinction between a school's equal access policy and school sponsorship of religion] where, as here, a reasonable observer would know ... [that] the tables displaying the Bibles are set up for only one day and are located outside of the classrooms in areas that the students can freely leave; no pressure is exerted on students to take Bibles; [and] the tables bear an explicit disclaimer renouncing any school endorsement."). It is one thing for students to see the distribution of Bibles in their cafeteria on only one day a year and not think that such distribution was sponsored by the school, but quite another if the same distribution occurs multiple times throughout the school year, as is entirely possible under this policy. In addition, the explicit disclaimer in Peck provided clarification for any questioning students about the sponsorship of the Bible distribution.
In addition to these restrictions for minimizing possible endorsement perception, the Fourth Circuit also relied on the school's historical practice in its endorsement ruling. In Peck, the school's 1989 written policy prohibited religious and political materials from being "distributed" to students. It was only after the School Board received a request in 1994 that they decided "passively making materials available" differed from distribution such that the Bible handout would not be prohibited by the written policy. Viewing the Board's decision against the backdrop of existing policy, the Fourth Circuit considered the district's historical practice of "forbid[ding] distribution of religious and political material altogether" and the district court's finding that this ban on distribution was intended to prevent violations of the Establishment Clause, when holding that the Bible distribution would not be perceived as an endorsement of religion to a reasonable observer. Id. at 280, 287.
Given the significant differences between the restrictions placed on the Bible distribution in Peck and the court's reliance on the district's historical practice in finding no threat of school endorsement for secondary students, I do not believe that the Fourth Circuit's ruling is directly applicable to the facts of this case. Based on the undisputed evidence before me, I conclude that the defendants' purpose is the promotion of Christianity by distributing Bibles to elementary school students. The policy has the principal or primary effect of advancing religion by conveying a message of endorsement to elementary school children.
None of the cases cited by defendants allowed Bible distribution to elementary school children on school property during the school day. Even the Fourth Circuit's finding for secondary students recognized that Supreme Court precedent required a different rule for elementary students. The School Board's policy fails the Lemon test and nothing in the cases relied on by defendants convinces me that allowing the Bible distribution proposed here is permissible under the Establishment Clause.
I conclude that the new policy violates the Establishment Clause. Plaintiffs are entitled to both declaratory and injunctive relief, for the same reasons they are entitled to that relief as to the past practice. The defendants have indicated that a request to distribute Bibles would be approved under the new policy, the policy would allow Bibles to be distributed on school grounds during school hours, and the plaintiffs would have no advance notice or way to stop the action. An injunction is appropriate to prevent the School District from further violating the Establishment Clause.

E. Counts III and IV: State Constitutional Claims
Plaintiffs did not seek summary judgment on their state claims, but defendants have sought summary judgment on those claims. Defendants urge that they are entitled to summary judgment because plaintiffs did not present evidence that defendants have provided a financial benefit to any religion, which would be required to show a violation of the Missouri constitution. In response, plaintiffs argue that the evidence presented shows that the District has provided the time of its administrators and teachers, who are paid by public funds and who have taken time from their public duties during the school day, to benefit the Gideons. There is evidence to support plaintiffs' position, and so I will deny defendants' motion for summary judgment as to these counts, and they remain pending.

Conclusion
I will grant plaintiffs' motion for summary judgment on Counts I and II of their amended complaint. I will deny defendants' motion for summary judgment. Plaintiffs are entitled to declaratory and permanent injunctive relief on Counts I and II. I will not enter judgment at this time, however, because Counts III and IV remain for trial or other resolution. The preliminary injunction will remain in effect until entry of final judgment. This order sets a schedule for the parties to tell me what needs to be done to resolve the remaining issues and enter final judgment. Once. I have reviewed the submissions that will be required, I will either enter a further scheduling order or set a hearing to discuss the next steps in the case.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment [# 68] is GRANTED, and defendants' motion for summary judgment [# 70] is DENIED.
IT IS FURTHER ORDERED that plaintiffs' motion to strike [# 81] is DENIED.
IT IS FURTHER ORDERED that plaintiffs' unopposed motions to provide supplemental authority [# 86] and to substitute party [# 93] are GRANTED.
IT IS FINALLY ORDERED that plaintiffs shall, no later than January 25, 2008, file a proposed schedule for the resolution of the remainder of the case, and defendants shall file any objection to plaintiffs' proposal and statement of their alternative proposal no later than February 8, 2008.
NOTES
[1] The parties have stipulated that the facts are undisputed and that the case should be decided on summary judgment. See Joint Consent Motion to Stay, Docket Entry # 76 (April 23, 2007). Although they each have filed limited objections to one another's Statements of Uncontradicted Facts, the only contested issues on the First Amendment claims are questions of law.
[2] Plaintiffs' motion to substitute Sarah Sullivan for Jeff Casteel was granted on May 24, 2007. Sullivan was elected to replace Casteel on the School Board in April of 2007. Although Casteel is no longer on the Board, he was a Board member when discovery was conducted in this case. His deposition testimony is still relevant and will be considered.
[3] Plaintiffs' seek to substitute Christy Ayers for Shirley Bieser, as Ayers is now the Principal. Defendants do not oppose this motion, and I will grant it.
[4] By this date the defendants were all in default, as most had signed waivers of service back in March.
[5] In defendants' motion for summary judgment they seek to renew arguments made in earlier motions, including asserting a defense of qualified immunity for the individual Board members. This argument was throughly evaluated in the Court's preliminary injunction ruling and nothing has changed regarding this argument since that time. The Court will not readdress this issue. Defendants are not entitled to qualified immunity, for the reasons stated in my earlier opinion.
[6] The Supreme Court in McCreary acknowledged the possible incongruity which could arise from a situation where the same governmental action could be found unconstitutional when the purpose underlying past actions is considered, but could be found constitutional when there is evidence of a sectarian heritage. 545 U.S. at 866 n. 14, 125 S.Ct. 2722. The Court found no incongruity in these results because purpose matters to objective observers. Id. Here, there is no incongruity in finding a facially neutral policy to have a religious purpose given the history and evolution of the policy.
[7] Up until the May 2007 amendments to the policy, the policy here also differed, from the Peck policy in that it did not expressly forbid the involvement of teachers or other school personnel in the Bible distribution. Other important safeguards present in Peck but absent here: signs on the tables informing the students only that they should feel free to take the Bibles or other materials offered, no one is allowed to enter classrooms to announce the availability of the material, and no school assembly or announcement is allowed concerning the availability of the materials. 155 F.3d at 275.